Good morning, Your Honors. Good morning. My name is Eric Merrifield, and I represent the petitioner Marat Nasybulin, and I would like to reserve two minutes. Mr. Nasybulin is from Uzbekistan, and he is an ethnic Tatar. It's an ethnic group that has suffered considerable persecution throughout Eastern Europe, and specifically in Uzbekistan. Now, the petitioner's argument today is a pretty simple and straightforward one. It is that the immigration judge erred by failing adequately to consider Mr. Nasybulin's claim that he would be individually targeted, even though the immigration judge was aware, had been made aware, of Mr. Nasybulin's unique role as an advocate for Tatar human rights. As the record makes clear, Mr. Nasybulin was a leader and an advocate, and actively promoted cultural awareness and human rights for this ethnic minority group. He started an organization that was devoted to Tatar rights, and that organization became active until it was disbanded by the police under threats of arrest. And Mr. Nasybulin himself and other participants in this group were told not to meet anymore, because if they did, that they would be arrested. The immigration judge was aware of this claim, found it to be credible, and specifically noted in his decision, this is at 137 in the record, that respondent expresses the viewpoint that he has been and will remain active in organizations seeking rights for the Tatars, and therefore he is at risk if he had to return. But at risk of what, I guess, is the problem that I have with your position? That is, persecution is extreme, and the fact that a country may have laws that we find completely unpalatable, such as not allowing free speech, I don't know if that counts as persecution. If what he's saying is I'm afraid that if I continue to speak out, I will be arrested and put in jail, but not necessarily harmed beyond that. Is that persecution under our cases? I don't know if that standing alone would be, Your Honor. But I think that there's more to that in this case. One of the reasons for Mr. Nasybulin's concern is that he is a known entity already. He's already somewhat recognized. We're not suggesting that he was a national leader, but he's recognized for his role advocating Tatar human rights, and that if he is – What specifically does he fear will happen to him, and why does he fear that specific thing? What he fears is that he will suffer what other people similarly situated have suffered. What the record shows is that over the last few years, especially since 2000, there have been a number of reported incidents of leaders of ethnic minority groups. There's one in particular in the record, the leader of an ethnic Tajik group, who tried to start one of these organizations promoting Tajik human rights. He was singled out. He was beaten, held for 20 days. So this combination of detention and beating clearly does meet the definition, the standard for persecution. And this is exactly what he fears. So even if he is returned to his back stand and is absolutely silent, takes no further action, that because he is already known for his activities, he fears that he might be subjected to that same sort of persecution. All of this fear of being individually targeted really takes place against the backdrop of and in the context of Mr. Nazibullin's claims about past persecution. And as you know, the immigration judge concluded that while the experiences that Mr. Nazibullin has may be discriminatory, may be harassment, that they don't rise to the level of persecution. These things include verbal abuse, ethnic slurs, loss of job opportunities, and physical assaults on family members. And we challenged the immigration judge's conclusions about past persecution, in part because we think that the wrong standards were applied. And the immigration judge actually made some personal speculations about what Mr. Nazibullin had endured when he was in Uzbekistan. To give just one example, Mr. Nazibullin claims that when he was in the military, he was detained and he was beaten. And when he was beaten, the people who were beating him actually used ethnic slurs. They called him a Tatar. And what the immigration judge did with that claim is say that as with many recruits, Mr. Nazibullin was subjected to physical acts of hazing. After that experience, though, he had this problem with his first college experience. He was discriminated against for being a Tatar, I guess. Although at that time, the Tatars were actively recruited or drafted into the Soviet Army. And after he got out of the Army, he came back to school and graduated and got a pretty good job with the government. That's right. I can't read that particularly. I mean, that episode of being discriminated against in college and hazing and so on as being the kind of persecution that we usually distinguish from discrimination or being a minority and being treated like a minority. What happened that made this, when he finally left, what were the circumstances? Was his wife already here? Mr. Nazibullin actually, just to clarify that one point, Mr. Nazibullin divorced his wife when he was in Uzbekistan and met his current wife here. So that's not the same family. It's not the same family. That's right. You're right that Mr. Nazibullin was able to finish his college education, that after he finished his college education, he got a government job. And I think it's largely relying on those facts that the immigration judge said, while there may have been a broad range of discrimination in Mr. Nazibullin's past, that it doesn't rise to the level of a person. Our problem is we have to be able to say that the evidence compels a contrary conclusion. Now, what compels a contrary conclusion? To be completely frank, Your Honor, I don't know that the record does compel a contrary conclusion. And the important point, I think, for purposes of the Court's decision and this argument, is that even if the record does not compel a contrary conclusion as to past persecution, that what the record does show is that these experiences show a background level of ethnic hostility in Uzbekistan. This is what the ordinary person goes through because of their ethnicity. And what the immigration judge did not address is the fact that Mr. Nazibullin stood out. He had a unique role. And that is completely not addressed in the immigration judge's decision. With respect to future persecution, that seems to be the key to your argument. That's right, Your Honor. And a number of cases really have focused on this distinction between general levels of ethnic hostility versus being individually targeted. And one of them that we discussed in the briefing is the Padash v. INS case in which this Court held that the only support for the Petitioner's claim was his generalized statement that the government in India is, quote, against Muslims. This statement, without more, is insufficient to establish that he is at, quote, particular risk of persecution if deported. Well, I guess I don't see – I'm having trouble if I were to write this down as to what is the evidence that compels the conclusion that he is likely to face future persecution if he didn't face past persecution. The evidence is two parts. One is a clear finding from the immigration judge that Mr. Nazibullin's testimony that he was active as a leader in human rights for this ethnic minority. It's credible that that's true. I'm sorry. Yeah, that it's credible. Yeah. And on the other hand, all of the evidence in the record that suggests that people in exactly that position who have participated as leaders in ethnic minority groups have been badly beaten and detained. And those things have really happened – Since the time that he left it. Since the time – I mean, the situation has really deteriorated. And what the record shows is that it's deteriorated because it's a certain regime that's consolidating its power. And how long has he been in this country? Since 1995. Thank you, Your Honor. Good morning again. John Williams on behalf of the government. This petitioner basically came to the United States to seek educational and economic opportunities. He had the authority to remain until August 1, 1996, and has never returned. Both the immigration judge and the board found that the petitioner failed to show past persecution and a well-founded fear of future persecution. In addition, the asylum adjudicator also reviewed the petitioner's case, and he denied the petitioner's asylum application. Mr. Nazibullin, the petitioner, has not – did not show any past persecution whatsoever. Well, it's clear that he showed past discrimination and harassment that didn't rise to the level of persecution. That seems to be what the immigration judge is saying as well. Yes. Things were not good for this individual, but not so bad as to be persecution. And he acknowledges that. And counsel's main argument seems to be that what that demonstrates is that he was noticed individually, as distinct from all others of his same ethnic group in his same town. He was noticed as an individual. And what is your specific response to counsel's argument that others similarly situated undeniably have been persecuted and that's why he fears future persecution? What's your response to that argument? My response is that there is no record evidence to support that. He cites to one Tajik individual throughout his brief and reply brief that he claims was attacked. But if you look at the country reports, the country reports state that Tartars are treated similarly just as all other individual ethnicities. In addition, there is no reference, record evidence reference to any attacks whatsoever on Tartars. So he's not mentioned anything regarding Tartars. And the what the immigration judge found was that there may have been some discrimination or harassment, but there was no persecution and it did not establish a rise to the level of a well-founded fear of future persecution. What is your response to counsel's argument that the situation has deteriorated in his native country and that the country report would also reflect that in respect to people who are human rights leaders? The I did not see in the country report where that was reflected and I don't know what counsel is citing to as far as any deterioration. Has it gotten a whole lot better? Maybe it hasn't, but as far as deterioration, it's not clear that it's clear that it's deteriorated. And when we go back and look at the petitioner's situation at the time that he was in Uzbekistan, he was able to get an education from the government. The government paid for his education. The government then hired him into a good job, which he chose to leave. He said he left because he was warned that if he continued to work for Carter Cultural Centers and so on, that he might be fired. Isn't that what the IJ believed? Well, that's what he testified to, but he didn't wait or respond to that. He chose to quit. But then he went on and obtained, started a successful business. His, the basis, the only basis, the only evidence of any claim of this petitioner is that as a successful businessman in dealing with government officials, he states that he was treated with scornful manners, bad service, and bad tone. And that's it. The cultural activities date back to 1990 and 91. He remained in the country until 1995, running his successful business. And the only thing subsequent to 1990 and 91 is the comment that he was treated with a scornful manner. That's it. He was never arrested. He was never detained. He was never physically abused. After 1990 and 91. That never occurred in Uzbekistan. I have a completely off-the-wall question. As I understand it from opposing counsel's argument, the Petitioner has remarried. Correct or not correct? News to me, Your Honor. Okay. Well, I was wondering what this is, as I say, completely off-the-wall. If his spouse is an American citizen, I wondered whether there was any opportunity for his status to be adjusted. Right. That's actually news to me. And when counsel mentioned that, one point I was going to make, and with this coming to light, which wife, who's he married to, is that at a particular time, he was married to a wife, according to the record, that was from Uzbekistan of Tartar ethnicity. Or mixed ethnicity. Or mixed ethnicity of Tartar background. And what's interesting is that she did not apply for asylum, even though she was of this background. Well, that seems irrelevant. He says he individually was a leader of human rights activities for his ethnicity, and therefore he individually would be targeted for that activity on behalf. And if his wife is not active, I mean, I guess I just think, I don't see the relevance of it. Well, if all, then okay. If he's relying solely on only a leader who is going to be attacked, and the general population, then, of Tartars are not attacked, why would and how would the country members even remember this petitioner if he returned? He's been out of the country for nine, for more than nine years. I don't want to derail your argument, but I noticed that his wife had filed an I-130 for him, and that was still pending. Why is the Bureau so interested in deporting him if that I-130 application is still pending? Well, it's just that, at the time of the record, is that it was pending. And that has no – that would have no bearing on his asylum application. Is there a holding pattern then after he gets a notice to report for removal of the deportation? Is that I-130 just going to a holding pattern? Not to my knowledge, Your Honor. I am aware that in some cases, and I'm not sure what the circumstances are, that the Attorney General has been willing to entertain mediation with respect to cases that involve pending applications by American citizen spouses in some of these kinds of situations where the individual on the other side is not being deported because of criminal activity, which seems not at all to be the case here. So I just commend that information to you for your consideration. Okay. Thank you, Your Honor. I would also just note that the record evidence does not establish that this Petitioner is one of a leader. He cites and states generally that he was leading a group, but later in the record he notes that he was one of the individuals who was attempting to create a cultural center. Clearly, this Petitioner has not established past persecution, and he has not established a well-founded fear of future persecution. And today, he does not present compelling evidence to this Court that his case should be overturned. I would ask that the Court deny his petition for review and affirm the immigration judges and the board's decision, as well as, in this matter, the asylum adjudicator who all denied his asylum leaving. Thank you.  Counsel, you have just a couple of seconds left. Do you want to help us out on what's happening with the spouse? Mr. Nazogulan met his current wife in the United States. She applied for the I-130 and has been married. She's an American citizen. She has just become an American citizen. And so we'll be contacting the Department of Justice to see whether something can be worked out on those grounds. On the issues before the Court, the one last point that I would like to briefly make is just that on page 139 of the record, this is page 7 of the IJ's decision, it's very, very clear about past persecution. It says, I agree with the asylum adjudicator's assessment that the Respondent has not experienced such atrocious treatment as to constitute past persecution. What we don't have in this decision is any kind of clarity on, like this, on the issue of well-grounded fear of future persecution. We don't have any indication that the IJ considered or grappled in any way with that issue, and so we would ask for the petition to be granted. Thank you. Thank you, counsel. The case just argued and submitted. That concludes the Court's calendar for this morning, and the Court stands adjourned. All rise. This Court for this session stands adjourned.
judges: Schroeder, Goodwin, Graber